THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DENNIS WHITE, Defendant-Appellant.

Third District    No. 80-240

Opinion filed December 31, 1980.

Robert Agostinelli and Stephen Omolecki, both of State Appellate Defender's Office, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

After a jury trial the defendant, Dennis White, was found guilty of intimidation in violation of section 12—6(a)(1) of the Criminal Code of 1961. (Ill. Rev. Stat. 1979, ch. 38, par. 12—6(a)(1).) The circuit court of Peoria County sentenced him to five years of imprisonment.

The only issue on appeal is whether the defendant was proved guilty of intimidation beyond a reasonable doubt. Specifically, the defendant contends that because the credibility of the State's principal witness was impeached and her testimony concerning the offense was otherwise improbable and unworthy of belief, he was not proved guilty beyond a reasonable doubt. We disagree.

The incident in question took place on January 7, 1980, in the second-floor apartment of Michael Stapleton, at approximately 3 p.m. At trial the

State adduced the testimony of the victim, Lucille People, Cheryl Gordon, and Officer Walter J. Jatkowski, Jr.

Lucille People testified that on January 7, 1980, she, the defendant, and Michael Stapleton were employed by the Peoria Department of Health, Rodent Control Division. After attending a morning staff meeting they were assigned to interview community members. The defendant, assigned as a supervisor, drove People and Stapleton in his car.

People first testified that they interviewed six residents between 10:30 and 11:30 a.m., but on cross-examination admitted that during that same time they went to purchase some marijuana. At 11:30 a.m. the defendant and Stapleton dropped off People at a friend's house for lunch. They picked her up at 1 p.m., took her to inquire about installing a telephone, and then they proceeded to Stapleton's apartment, arriving at about 1:30 p.m. She testified that they began completing their work assignments, but on cross-examination admitted that she, the defendant, and Stapleton smoked marijuana while at the apartment.

Approximately one hour later she told the defendant that she wanted to leave Stapleton's apartment and return to work, but the defendant refused to oblige her because she allegedly owed him money which he then demanded that she repay. She told the defendant that she had no money, but that if they were to drive her to work she would buy both of them a chicken dinner. Stapleton then grabbed her and the defendant removed $106 from her shoe. People attempted to flee, but Stapleton slapped her. Stapleton gave back the $106 after People began to cry.

People testified that the defendant then demanded that she have sex with him, but she refused. The defendant then demanded that People take pictures of herself while nude, but she refused that demand also. The defendant persisted in his demands that People take nude photographs of herself, declaring that if she refused, he would tie her up and force her to take the pictures. Finally, People said she would take the pictures, but only if the defendant and Stapleton left the apartment. They allegedly left and waited outside in the hallway. People, given a Polaroid land camera and a disposable flashbar unit by the defendant, fired the flashes without taking any photographs of herself. After the defendant reentered the apartment and learned what People had done, he produced a second flashbar and ordered her to take the picture. At that time he allegedly held in his hands a baseball bat belonging to Stapleton, and with it he threatened that if People refused to take the photographs of herself nude, he would "shove" the bat into her vagina. Again People said she would take the pictures, but only if the two men waited outside the apartment. She spent the second flashbar again without taking any photographs. Stapleton, by this time disgusted, left for a drugstore. The defendant, upon reentering the apartment, again threatened to shove the baseball bat into

her vagina. Then the defendant slapped her with such force that she fell to the floor. The defendant continued to threaten her during the 30-minute period which Stapleton was gone, and he also began spraying her with ignited hairspray.

People further testified that she finally convinced the defendant to return her to the Department of Health. As the defendant and People were leaving the apartment house, he told her that he forgot something in Stapleton's apartment and ran upstairs to retrieve it. People did not flee, nor did she call to a passing couple for assistance. Upon returning to work, People called the police.

On cross-examination People admitted that she smoked marijuana in Stapleton's apartment on the date in question, but denied that she tried to convince the defendant to falsify his Department of Health worksheets. She also denied telling the defendant and Stapleton that she received $70 for a "dude trick" at lunch time that day and that she could have made more money had she had more time. She then admitted that she might have said "dude trick" but such a phrase did not connote to her prostitution. People further testified that she had not previously been inside of Stapleton's apartment and that she had not previously seen the defendant socially. She admitted, however, that neither of the blows delivered by the defendant or Stapleton resulted in bruising her.

The State also introduced the testimony of Stapleton's sister, Cheryl Gordon, who testified that on the afternoon in question she saw the defendant's car parked outside Stapleton's apartment. Officer Jatkowski, testifying for the State, said that upon searching Stapleton's apartment he discovered spent flashbars adaptable to a Polaroid camera, a baseball bat belonging to Stapleton located at the bottom of the landing of the apartment house, and hairspray matching the type that was used to "spray" People with fire.

The defendant introduced several witnesses who testified that they had seen People and the defendant together socially several times prior to the date in question. One witness placed them at Stapleton's apartment approximately two months before the instant offense occurred.

Michael Stapleton then testified, stating that People told him that during her ostensible lunch break on January 7, she in fact performed a "dude trick" that had netted her $70. He assumed the phrase "dude trick" connoted prostitution. He also testified that at his apartment she tried to convince the defendant and Stapleton to falsify their worksheets for that date, saying, "you better learn how to lie." Stapleton denied striking People and testified that he never witnessed the defendant strike her. He further stated that any threats made by the defendant or himself were merely jokes. According to Stapleton, People voluntarily suggested that she take nude photographs of herself and when she failed to do so,

Stapleton left the defendant and People alone in his apartment. Stapleton, as a codefendant, was testifying in his own defense.

Finally, Stapleton testified about a tape recording made that afternoon in his apartment. The defendant apparently taped their stay at Stapleton's apartment in case People attempted to say anything to their superiors at the Department of Health about their failure to work that day. The defendant's demeanor towards People during the taped conversation became increasingly hostile. The defendant was upset with People because he placed his job in jeopardy when he dropped her off at lunch time. He was also upset that People had lied to him about how much money she had on her person. The defendant talked of placing her in a bathtub full of hot water and "beating her ass" with a baseball bat. People then made some crying sounds. The tape recording ends with the defendant talking about People being "set up."

■■ The determination of the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence belong to the trier of fact. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733; *People v. Cole* (1978), 57 Ill. App. 3d 396, 373 N.E.2d 106.) Unless the evidence is so improbable as to raise a reasonable doubt of the defendant's guilt (*People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671; *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666), a court of review will not substitute its judgment for that of the trial court where the evidence merely conflicts (*People v. Clark* (1964), 30 Ill. 2d 216, 195 N.E.2d 631). Further, it is settled that the testimony of a single witness is a sufficient basis upon which to sustain a guilty verdict. *People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182.

Nevertheless, the defendant first contends that because of the presentation of evidence impeaching People's testimony relating to collateral matters, she demonstrated no compunction about committing perjury; therefore, her entire testimony became tainted and the defendant's conviction should not stand on such a "thoroughly discredited witness." We disagree with the defendant's characterization of People's testimony.

The defendant concedes that the inconsistencies in People's testimony—whether she smoked marijuana that day, whether she knew the defendant socially, whether she committed an act of prostitution, whether she attempted to persuade the defendant to falsify his worksheets—were unrelated to the crime of intimidation. Those inconsistencies to which the defendant points were not central to the actual offense of intimidation, but related only to collateral matters. While People's credibility was suspect because her testimony was not entirely consistent with other statements, which included Stapleton's extremely self-interested declarations, her credibility and the weight to be given her testimony were peculiarly within the province of the jury. (*People v. Cole* (1978), 57 Ill. App. 3d 396,

373 N.E.2d 106.) The jury was informed of the inconsistencies, but it chose to believe People's testimony.

It should further be noted that the tape recordings corroborate the testimony of People and served to buttress the credibility of her testimony.

An argument similar to that advanced by the defendant in the case at bar was rejected in *People v. Gallo* (1973), 54 Ill. 2d 343, 297 N.E.2d 569. There the State's chief witness in an intimidation prosecution was impeached several times by his prior inconsistent statements. He was also an admitted thief and liar, who was deeply in debt. The supreme court affirmed the conviction because the testimony in question was corroborated by an eyewitness and because the trier of fact, after being presented with the conflicting evidence, chose to believe the prosecution's impeached but rehabilitated witness. The same analysis was used in *People v. Cole*, where an intimidation conviction was affirmed over the objection that the principal witness was impeached by her prior inconsistent statement made to police. This court, in *Cole*, noted that the witness' testimony was corroborated by her son's testimony, which was itself "suspect", but which the jury chose to believe and which was not so improbable as to raise doubt of the defendant's conviction.

■■ The defendant also contends that People's testimony contains several improbabilities that tax the gullibility of the credulous, making it too contrary to universal human experience to be worthy of belief in that (1) it was unlikely that the defendant would twice leave the victim alone in Stapleton's apartment had he been truly serious about his threats, and (2) People did not attempt an escape from her intimidators even though she was left alone twice in the apartment and once outside as the defendant returned momentarily to Stapleton's apartment. We disagree with this contention. We first note that Stapleton's apartment was located on the second floor of an apartment house, with the only apparent reasonable means of escape being the door outside of which the defendant stood. Although People could have locked the apartment door when the defendant waited outside, such an action would only serve to provoke the defendant further and would most likely prove to be a fruitless gesture because the owner, Stapleton, would certainly have a key to his own residence. Secondly, it is clear from the victim's testimony that the defendant was greatly angered with her when he and Stapleton discovered she had not taken the photographs the first time. His threats became more vicious, and he warned her that if she refused to cooperate he would place the baseball bat in her vagina. We cannot agree with the defendant's assertion that the testimony of the complaining witness People was impeached to such an extent that the jury could not find him guilty beyond a reasonable doubt.

After careful consideration of all the evidence presented at trial, we believe sufficient evidence was presented from which the jury could find the defendant guilty beyond a reasonable doubt.

Affirmed.

BARRY and STOUDER, JJ., concur.